Footnotes in HTML versions of opinions 
are designated by superscript “balloons” or boxes (click on either for the 
footnote text) and are not numbered. For an exact copy of the opinion, retrieve 
the Adobe PDF version.
IN THE SUPREME COURT OF TEXAS
════════════
No. 
04-1144
════════════
Shirley Neeley,
Texas Commissioner of Education, et al., 
Appellants,
v.
West Orange-Cove Consolidated
Independent School District, et al., 
Appellees
consolidated 
with
════════════
No. 
05-0145
════════════
Alvarado Independent School 
District,
et al., Appellants,
v.
Shirley Neeley,
Texas Commissioner of Education, et al., 
Appellees
consolidated 
with
════════════
No. 
05-0148
════════════
Edgewood Independent School 
District,
et al., Appellants,
v.
Shirley Neeley,
Texas Commissioner of Education, et al., 
Appellees
════════════════════════════════════════════════════
On Direct 
Appeal from the
250th 
District Court of Travis County, Texas
════════════════════════════════════════════════════
Argued July 6, 
2005
            Justice Brister, 
dissenting.      
            In 
the name of “efficiency,” several school districts again ask the Texas courts to 
close the Texas public schools unless the Texas Legislature increases funding. 
Over the last two decades, we have been asked to do this every two or three 
years, and have generally complied.
            The 
Court goes too far by doing so again today. First, the Court finds school 
districts are forced to tax at the highest possible rate only because some of 
them do. Second, though only five percent of the State’s school districts claim 
a single statute is unconstitutional, the Court enjoins the State from 
distributing any money under the current Texas school financing system, 
an order that applies to every school district in Texas. Thus, because some 
districts get too little state money, all districts may get none. It is hard to 
see how this will help Texas school children. 
            Yet 
the Court also does not go far enough. By failing to demand an “efficient 
system” as the Texas Constitution requires, or to demand standing and proof as 
Texas law requires, this case once again focuses on short-term funding rather 
than long-term solutions. 
            Of 
course, the true goal of this litigation is to put pressure on the Texas 
Legislature. We demanded legislative changes by holding the Texas school-finance 
system unconstitutional in Edgewood I, 

 Edgewood II, 

 and Edgewood III; 

 we warned that we might do so again soon in Edgewood IV 

 and West Orange-Cove I. 

 The Court fulfills that threat today. But there is no end in sight; if the past 
is any indication, the new funding will not last long, and public education will 
not change much.
            Before 
we bequeath Edgewood VIII, IX, and X to our 
grandchildren, we should consider whether we might do more by doing less. As the 
Court fails to do so today, I respectfully dissent.I. The Constitution & Efficiency
            Since 
statehood in 1845, every Texas Constitution has required the Legislature to 
“make suitable provision for the support and maintenance of public schools.” 

 But when Texans adopted the current Constitution in 1876, they added a new word 
— the Constitution now requires “suitable provision for the support and 
maintenance of an efficient system of public free schools.” 

 
            Were 
we drafting a constitution today, we might choose a different standard — perhaps 
an “exemplary” or “comprehensive” or “progressive” or “safe” system of public 
schools. But in 1876, the people of Texas adopted “efficient” as the 
constitutional standard, and until that Constitution is amended no court can 
adopt any other.
            When 
this Court issued Edgewood I in October 1989, we recognized that an 
“efficient” system would “produce results with little waste.” 

 Nevertheless, we have applied the term in every case since then to require only 
one thing — “substantially equal access to similar revenues per pupil at similar 
levels of tax effort.” 

 In other words, “efficient” has meant only “equal ability to raise taxes.”
            Perhaps 
this made sense in 1989 — before the Berlin Wall fell, before the Soviet Union 
collapsed, and before state-run businesses everywhere proved uncompetitive. 
Perhaps back then a government system was “efficient” if it could get sufficient 
public funding.
            But 
surely not now. Today, we know that one thing above all else makes service 
providers efficient: competition. Even formerly communist countries recognize 
how efficiency is produced — not by protectionism, not by higher taxes, and not 
by state control, but by freedom for competition.
            Yet 
the school districts that brought this case never once suggested in six-weeks’ 
evidence that competition might make the Texas school system more efficient. No 
one considered fundamental reforms that efficiency might demand. No school 
expert considered whether it might be efficient to consolidate tiny school 
districts or redundant school administrations. No one asked whether it might be 
efficient to transfer students across district lines, or transfer funds to 
private providers that could meet their needs better. Instead, this trial 
focused entirely on getting more state funding through more taxes — all else in 
the system to remain exactly the same.
            This, 
of course, is perfectly natural. Few of us welcome competition, not even judges. 


 Competition is often painful, and requires us to make hard choices we would 
rather avoid.
            But 
long-standing rules of Texas law do not allow us to wink at these omissions 
here. First, because Article VII’s education guarantee is a right that belongs 
to school children rather than school districts, the latter have no standing to 
assert this claim. Every party in this case was a school district, and every 
witness in the six-week trial was a school employee or school expert. Not a 
single attorney represented solely the interests of school students and their 
families — who might actually favor the broader educational options or lower 
taxes competition might bring. By overlooking standing, this trial focused too 
much on the priorities of school districts, and not enough on the priorities of 
school families.
            Second, 
because Article VIII’s constitutional prohibition of state property taxes is 
violated only if a school district must tax at the statutory maximum, each 
district had to prove it was forced to do so. The 47 plaintiff districts alone 
asserted this, but none proved it. No school district addressed, no expert 
studied, and none of the trial judge’s 679 findings mentioned why districts were 
“forced” to make expenditures that other public and private schools often 
forego, or that other government entities often provide. Nor did anyone consider 
whether competition or other fundamental reforms might make the system more 
efficient so that less money was necessary. By lowering the burden of proof, 
this trial focused on whether school expenditures were reasonable rather than 
required.
            My 
colleagues say our review of “efficiency” must be limited to funding because 
“[w]e cannot dictate how the parties present their case.” 

 This Court is not usually such a pushover. When we interpret contracts, 
statutes, and (above all) constitutions, we are constrained by what they say, 
not the parties’ briefs. The constitutional guarantee invoked here requires an 
efficient system of public schools; it cannot be used to demand more funding for 
an inefficient system.
            Nor 
can we avoid our duty by suggesting that the Legislature demand efficiency when 
we will not. 

 If efficiency is a justiciable question (as the Court holds), then we cannot 
simply suggest that someone else look into it. 
            The 
author of the current school-finance system testified at trial that school 
districts “were no more wasteful or inefficient than any other State agency or 
State institution.” But that is not the constitutional standard. For whatever 
reason, the Texas Constitution mandates efficiency primarily in the State’s 
courts 

 and schools; 

 they must meet a higher standard because that is what the Constitution 
requires. If “efficiency” truly means “producing results with little waste,” 
then someday we ought to apply it to that purpose.
II. Article VII & StandingA general diffusion of knowledge being 
essential to the preservation of the liberties and rights of the people, it 
shall be the duty of the Legislature of the State to establish and make suitable 
provision for the support and maintenance of an efficient system of public free 
schools.
Texas Constitution, Article VII, § 1While 
acknowledging evidence that the public school finance system is inadequate, 
unsuitable, and inefficient, the Court nevertheless finds no violation of 
Article VII because “an impending constitutional violation is not an existing 
one.” 

 We have tried this before, accepting the current system while lamenting it, and 
warning that the result might be different next time. 

 
            But 
this is the first time we have entertained such complaints in a courtroom with 
no students. While standing normally requires only an allegation of injury, a 
two-part test governs standing to challenge the constitutionality of a statute: 
(1) an allegation of actual or threatened injury under the statute, and (2) an 
allegation that the statute unconstitutionally restricts the plaintiff’s own 
rights. 

 As all concede, the public-education guarantee in Article VII of the Texas 
Constitution is a right that belongs to school students, not school districts. 
Yet only the latter were represented at trial, and as the trial made clear, the 
interests of the two are not necessarily the same.
            Standing 
is required by two guarantees in the Texas Constitution — separation of powers 


 and open courts. 

 We should not violate these two constitutional provisions in order to decide 
whether the State violated two others.
A. A Question We Have Never Addressed
            This 
is the first Article VII school-finance case brought solely by school districts, 
without a single family or school student as plaintiff. 
            In 
Edgewood I, 68 school districts and “numerous individual school children 
and parents” filed suit. 

 Edgewood II involved subsequent proceedings in the same suit with the 
same parties. 

 Edgewood III was brought by “numerous school districts and individual 
citizens.” 

 Edgewood IV was filed by “hundreds of school districts . . . as well as 
many parents and local officials.” 

 
            None 
of these cases approved school-district standing under Article VII. Nor did they 
approve such standing implicitly, as standing cannot be waived and may be raised 
during any later appeal. 

 
            To 
the contrary, in Edgewood IV, we held that section 3 of Article VII 
granted no constitutional rights to school districts:
Article 
VII, section 3 does not create any “rights.” It only authorizes the Legislature 
to establish school districts and to empower the districts to levy taxes for 
specific purposes. The school districts’ rights, to the extent they exist, are 
derived solely from the statutes that the Legislature may enact under the 
authority granted in section 3. 

 
Similarly, section 1 of 
Article VII does not create any rights for school districts; in fact, it does 
not even mention them. To the extent school districts assert injury here, they 
cannot do so for any violation of this constitutional right.
            While 
school districts participated in all our prior Article VII cases, their standing 
was immaterial because school families participated too. When several parties 
make the same claim for declaratory or injunctive relief, standing for some 
renders standing for the remainder immaterial. 

 Federal law is to the same effect. 

 As all our prior cases included parties whose sole interest was the education 
of their children, the State had nothing to gain by objecting to school-district 
standing, and the judgments would have been no different if it had.
            There 
is certainly no “broad rule that a governmental entity cannot sue to declare a 
statute unconstitutional.” 

 But there is no broad rule that they always have such standing either. 
Just because school districts have standing to bring some claims does not mean 
they have standing to bring all claims. 
            Instead, 
standing depends on the nature and source of the claim being made. 

 While school districts have standing to pursue an Article VIII claim, 

 that does not mean they have standing to pursue an Article VII claim. We have 
never suggested otherwise, until today.
B. Standing We Have Never Recognized
            Before 
today, we have never held that government agencies have standing to sue the 
State for a bigger budget. 
            The 
school districts allege they have insufficient money to carry out their duties, 
but it is not money for their own account. As we held long ago, school districts 
hold money only as trustees for school students:
School 
funds are held to be trust funds for educational purposes. Such funds do not 
belong to the district or to the officers of the district, but are merely held 
by them in trust for the public. 

 
The injury alleged in this 
case was suffered only by school students: to the extent school districts must 
cut courses, or eliminate extracurriculars, or hire less-qualified teachers, it 
is the students who suffer the concrete, personal harm rather than the districts 
themselves. 
            The 
school districts alleged only that inadequate state funding limited their 
ability to perform their official duties. Both state and federal courts have 
rejected standing by government officials to bring such claims. 

 Thus, we held in Brown v. Todd that a city councilman lacked standing to 
challenge a mayor’s personnel policy that did not apply to him, but merely 
infringed his ability to set such policies. 

 Similarly, the United States Supreme Court recently held that grant recipients 
but not members of Congress had standing to challenge the Line Item Veto 
Act(though the Act granted standing to both), as the former actually lost money 
while the latter lost only their discretionary power to dispense it. 

 
            This 
is not a case like Nootsie, Ltd. v. Williamson County Appraisal District, 
in which a public entity was compelled to affirmatively grant a tax exemption it 
believed unconstitutional. 

 The districts do not complain that they are affirmatively compelled to perform 
unconstitutional teaching, testing, or any other services; they complain only 
that they are underfunded. 
            The 
Court’s suggestion that we have recognized standing before in these 
circumstances is indefensible. In Vondy v. Commissioners Court, we 
ordered commissioners to pay a constitutionally required salary when they had 
refused to pay any. 

 In Mays v. Fifth Court of Appeals, we ordered commissioners to pay a 
statutorily allowed raise which they had ignored. 

 Both cases involved nondiscretionary ministerial acts; 

 neither involved a dispute between an agency and the State about whether the 
former’s budget was big enough.
            The 
Court justifies standing here because “the Legislature has required school 
districts to achieve the goal of a general diffusion of knowledge.” 

 But that gives them no rights against the State. As we noted in Edgewood 
IV, the State can abolish school districts completely, or enlarge or 
diminish their powers. 

 Further, the Texas Constitution requires the Legislature to provide for many 
things — roads and bridges, 

 the Legislative Redistricting Board, 

 the Judicial Conduct Commission, 

 and the salaries of thousands of public employees. 

 These are all important items, and some may be underfunded; but surely all do 
not have standing to sue the State for more.
            In 
every analysis of standing, “the plaintiff must contend that the statute 
unconstitutionally restricts the plaintiff's rights, not somebody else’s.” 

 This the school districts cannot do.
C. Priorities We Have Never Approved
            One 
reason courts require standing is amply demonstrated by the evidence in this 
trial, which tended toward a wish-list for school district employees.
            Eight 
superintendents testified for the school districts at trial, each listing what 
they needed or what they would do if they had more money. Their priorities were 
almost identical: more bilingual teachers, more certified teachers, more 
certified librarians, more teacher training, higher salaries, better benefits, 
smaller classes, and longer school years.
            Each 
of these may be important. But if eight families from the same districts had 
testified at trial, is this what they would have listed? Assuming all could not 
be fully funded, would they have listed them in the same order? We simply do not 
know. 
            We 
do know that, for most of us, our priority as employees is higher salaries, 
while our priority as customers is lower prices. Both may be possible when 
competition increases efficiency, innovation, and productivity. But at some 
point the two inevitably conflict, and some compromise is necessary. Because the 
trial here included only education providers and no education customers, the 
evidence may not accurately reflect where that line should be drawn.
            Moreover, 
fundamental reforms may be overlooked if school districts may assert Article VII 
claims by themselves. Here, for example, not a single expert witness studied the 
possible savings that might accrue from consolidating some of the State’s 1,031 
school districts. This Court has repeatedly lamented the “crazy-quilt pattern of 
small school districts,” 

 as a result of which “duplicative administrative costs are unavoidable.” 

 The plaintiffs’ experts confirmed that smaller districts have “the highest 
level of expenditures per student, as one would expect,” because of 
“diseconomies of scale.” Yet not a single school district or expert witness 
suggested any consolidations. 

 
            It 
is unrealistic to ask school boards and administrators to recommend their own 
abolition, or lower salaries for themselves or any employees. Such potential 
conflicts between the interests of school districts and school families prevent 
the former from claiming standing to represent the latter. We have recognized 
representative standing in some circumstances, 

 and sometimes state agencies may assert standing on behalf of their 
constituents. 

 But we have done so only when the goals of a group and its members are so 
closely aligned that there is no reason to require participation by one in a 
suit by the other. 

 That is not the case here.
            In 
its final analysis, the Court dispenses with standing generally, because (1) 
students and families were free to intervene, and (2) the districts could find 
students and families to back their claims. Even if we assume that poor families 
can hire lawyers, or school districts can recruit sham plaintiffs to bolster 
their claims, it is hard to see what that has to do with the standing of the 
parties actually before us. More important, such arguments could be made by 
every party who lacks standing, including millions of taxpayers, 

 or the father whose challenge to the Pledge of Allegiance was recently rejected 
for lack of standing. 

 Normally, this Court strictly enforces standing so that we retain our proper 
role; 

 hopefully today’s exception is good for this case only.
            Standing 
is not a technicality; it is essential to any court’s authority to decide a 
case. 

 We cannot abandon it in noteworthy cases; indeed, that is when adherence to 
legal standards is most important. As the United States Supreme Court recently 
noted, courts must be “especially rigorous” in requiring proper standing when 
asked to declare the actions of the other two branches of government 
unconstitutional. 

 The school districts alone cannot meet such standards here.
III. Article VIII & Discretion
No State 
ad valorem taxes shall be levied upon any property within this State.
Texas Constitution, Article VIII, § 1-e
            The 
47 plaintiffs, mostly property-rich school districts, bring a claim that Article 
VIII, section 1-e of the Texas Constitution is violated by a tax-rate ceiling in 
a single subpart of a single statute. 

 Unlike Article VII, Article VIII was intended to benefit school districts, and 
thus they have standing to assert this claim. 

 
            In 
Edgewood III, we declined to adopt a precise test for violations of 
Article VIII because state control over property taxes presents “a spectrum of 
possibilities.” 

 Instead, we held that a tax violates Article VIII if the State so completely 
controls the levy, assessment, and disbursement of revenue that school districts 
are “without meaningful discretion.” 

 In Edgewood IV, we explained that districts lose such discretion when 
they are “forced to tax at the maximum allowable rate just to provide a general 
diffusion of knowledge.” 

 
            This 
appeal turns on whether the plaintiffs proved they were “forced” to tax at the 
maximum rate. In reviewing the evidence, the Court contradicts everything we 
have said about such evidence before, and adds new “factors” we apparently 
overlooked before. This is too imprecise; a legal standard cannot turn on 
entirely different evidence from one case to the next. 
A. The Wrong Standard: Everybody Else Does 
It
            The 
Court points to several statewide trends as evidence of an Article VIII 
violation. But in our previous cases, we held that evidence just like this could 
not show an Article VIII violation.
            First, 
my colleagues suggest that school districts are forced to tax at maximum rates 
because about half of them do. While we have never stated in detail what the 
Article VIII standard means, we have stated one thing it does not mean — 
“the number of districts taxing at maximum rates is not determinative.” 

 In West Orange-Cove I, we expressly rejected arguments that an 
unconstitutional state property tax must control the rates in every 
district (the State’s position) or most districts (the trial court’s 
conclusion); instead, we held that an ad valorem tax is unconstitutional if it 
is imposed by the State, no matter how many districts it covers. 

 If the State could not use prevailing tax rates to prove the school districts 
should lose, why can the school districts now use them to prove they should 
win?
            Second, 
the Court reverses field by concluding that close-to-maximum rates show that 
many districts lack meaningful discretion. Only two years ago, we said close 
counts neither way: “It may be that a school district taxing at $1.47 instead of 
$1.50 has exercised meaningful discretion, but that is not necessarily the 
case.” 

 The number of districts taxing in this range simply cannot tell us whether “a 
single district . . . is constrained by the State to tax at [this] particular 
rate.” 

 
            Third, 
the Court finds it important that districts are taxing and spending 97 percent 
of the revenue that would be available if every district taxed at maximum rates. 


 But in Edgewood IV we noted, and school district witnesses conceded at 
trial, that financial incentives in the current school-finance system encourage 
school districts to tax at maximum rates even if they don’t have to. 

 The current system does not force districts to tax at maximum rates merely by 
providing incentives for them to do so.
            Fourth, 
the Court announces today that substantial transfers of tax revenues from rich 
districts to poor districts are “a significant factor” in rendering the current 
system unconstitutional. 

 Of course, we demanded something along these very lines when we required 
equalized funding in Edgewood I. Further, we held such transfers 
constitutional in Edgewood IV; 

 today’s opinion appears to adopt the dissent in the latter case. 

 
            Finally, 
the Court supports its constitutional conclusion by noting a “marked decline” 
since 2001 in the number of districts that “exceed minimum accreditation 
standards.” 

 We have never before tied constitutional analysis to testing or accreditation 
scores, and today’s reference shows why we should be reluctant to enter that 
hotly debated area. For example, if the base year in this trend were 1994 rather 
than 2001, then there has been a marked increase in the number of 
districts exceeding minimum standards. Further, as the standards themselves are 
rising, declining scores may or may not reflect actual declines. And the 
“minimum” standard referenced here is “academically acceptable”; nothing in this 
rating system proves the State is “forcing” every school district to rate above 
average.
            Surely 
we were not mistaken in all our previous cases. If revenue transfers and 
accreditation scores were relevant to Article VIII’s standard, it is curious 
that we have never mentioned them before. And merely looking at average tax 
rates cannot tell us whether any district was “forced” to that level or arrived 
there via “meaningful discretion.” 
            Whether 
any school district in Texas has lost “meaningful discretion” is not a standard 
that can be proved by statewide trends. School districts are not forced to tax 
or spend money just because everyone else does it. 

 The standards this Court has established require more specific evidence of a 
violation of Article VIII. 
B. The Right Standard: What Must This District 
Do?
            The 
school districts cannot establish a violation of Article VIII by proving that 
their current budgets are customary, or even reasonable; the tax cap they 
challenge is unconstitutional only if they proved they were forced to tax at 
that rate. 
            By 
definition, districts are not “forced” to make discretionary or voluntary 
expenditures. Of course, some expenditures may be mandatory de facto, 
even though not mandatory de jure. 

 For example, Texas school boards or administrators who cut football programs or 
drill teams (as the State’s attorneys bravely suggest) may soon find themselves 
looking for other occupations.
            But 
the Court adopts a standard far too low by holding that districts are “forced” 
to tax at maximum rates whenever their “professional judgment and experience” 
suggests they should. 

 Undoubtedly, school districts want to give their students the best education 
possible, and an educator’s professional judgment would deem anything less to be 
undesirable. But in Edgewood IV, we rejected a claim that districts were 
“forced” to transfer revenues “because the various alternatives are all 
undesirable.” 

 By equating professional preferences with coercion, my colleagues again follow 
the dissent rather than the majority in Edgewood IV. 

 
            The 
districts did offer examples of expenditures that were mandatory, and programs 
that were cut. But as proof that districts are forced to tax at maximum rates, 
both are non sequiturs. Proving that some programs are mandatory does not prove 
that all others are too. Nor does it follow from cuts in one program that no 
further cuts can be made. To the contrary, the reluctance the superintendents 
expressed at trial about such cuts served to prove, if anything, their 
reluctance to cut any programs at all.
            Moreover, 
the State’s trial evidence of discretionary spending did not focus on 
remedial-reading or bilingual-education programs. Instead, the State pointed to 
undisputed expenditures for swimming pools, nature trails, athletic stadiums, 
tennis courts, and unconventional classes such as broadcast journalism, 
ceramics, power lifting, ballet, film critique, lego robotics, advanced 
mariachi, and culinary arts. 
            It 
is true that several superintendents testified that all these programs were 
needed to keep students in school. But if we take these claims at face value 
then nothing schools spend is discretionary. “[A] claim will not stand or 
fall on the mere ipse dixit of a credentialed witness.” 

 These opinions alone cannot support the trial court’s judgment, both because 
they are conclusory, 

 and because the question is a legal one. 

 This Court is not usually so generous in treating such testimony as “facts, not 
opinions.” 

 
            Further, 
none of the school districts explained why they were “forced” to maintain 
athletic facilities or library services that local governments often provide, or 
unconventional classes that might be available through local community colleges 
or the internet. No one would suggest that communities can run their fire, 
police, or utility departments through a school district’s budget, thus shifting 
those costs to the State or richer districts. The trial court could not simply 
assume there were no alternative providers; the school districts had to prove 
it.
            Similarly, 
several superintendents conceded paying the highest starting salaries in their 
region, or special stipends to attract particular types of teachers. Considering 
the importance of what they do, no one can begrudge teachers higher salaries; 
but these contribute to a violation of Article VIII only if school districts had 
no choice. If surrounding public or private schools pay less, it was the 
districts’ burden to prove why they could not.
            When 
pressed to explain such expenses, district witnesses repeatedly pointed to the 
demands of their local communities. But again, local demand must be proved, not 
merely asserted. As no students or families testified at trial, the only proof 
was the conclusory assurances of school administrators. 
            In 
a democracy, community demand is proved by elections, not anecdotal hearsay. In 
many instances, schools can buy property using school bonds (which require 
electoral approval) or the general operations budget (which does not). We cannot 
tell from this record which programs had been approved at an election, or what 
percentage of the community actually participated. Surely a district cannot 
avoid elections on expensive programs, or schedule them to ensure low voter 
turnout, 

 and then claim they were forced to adopt those programs by their community. 

 Without such proof here, we simply cannot tell.
            Finally, 
because fundamental reforms were never considered, we do not know whether they 
might allow districts to drop rates below the tax ceiling. School districts 
cannot spend money inefficiently (subverting Article VII) to “force” themselves 
to the tax ceiling (subverting Article VIII), as these articles must be 
construed consistently to give effect to both. 

 School districts may have good reasons to avoid consolidating, or starting 
school later in the year, or increasing class size so that teachers’ salaries 
could be increased too. But they are forced to make current expenses only if 
saving money through such alternatives was impossible, not just unpopular.
            Of 
course, had the trial judge required specific evidence that the districts were 
forced to incur substantially all their current expenses, it would have been 
much more difficult for the districts to prove an Article VIII violation. But 
proving a statute unconstitutional is not supposed to be easy. We must presume 
the current system is constitutional, and interpret it whenever possible in a 
manner that renders it so. 

 This presumption is “especially strong” when statutes relate to taxation, 

 and “especially important” when we deal with politically charged subjects like 
the schools. 

 
            There 
was plenty of evidence at trial that public schools are being asked to carry 
increasingly heavy burdens, burdens that private schools often do not bear. For 
example, as one superintendent noted, “it is not easy to remove employees in the 
public sector.” Accountability and testing systems have raised expectations that 
somehow all schools and school children can be at or above average. Teachers and 
administrators face the risk that the failure of their students will cause their 
own professional efforts to be labeled “academically unacceptable.” And as all 
the witnesses agreed, a growing stream of immigrants with little formal 
schooling or English proficiency requires that public schools not only leave no 
child behind, but go back at great expense and pick up more as soon as they 
arrive. 

 
            Nevertheless, 
the Article VIII standard is not whether educational expenditures are 
reasonable, or important, or far-sighted, or what a community would prefer, but 
whether a district is forced to make them. Before the courts can declare the 
State’s school-finance system unconstitutional, each and every district must 
prove it had no other choice. Here, none did. 
IV. Equity & Overbroad Relief
            Permanent 
injunctions “must be narrowly drawn,” 

 and “the record must contain evidence supporting each injunctive provision.” 

 This one meets neither standard. 
            It 
is neither true nor “worth repeating” that these standards can be ignored 
because the State asks for no injunction rather than a narrower one. A 
court must craft an equitable injunction even if it is not precisely what either 
party wants. 

 If the rule were otherwise, the Court should not postpone the injunction here 
until June 2006 — as neither party asked for that. Hopefully, today’s rule is 
once again good for today’s case only.
A. Too Many Districts
            First, 
there is no evidence to support a constitutional violation in every school 
district in Texas. 
            Out 
of 1,031 school districts in Texas, only 329 filed suit, only 47 asserted the 
single constitutional claim the Court affirms, only 9 presented proof on that 
claim in any detail, and only 3 called a witness to prove it at trial. On this 
narrow basis, the Court declares the school-finance system in every district 
unconstitutional, and enjoins state funding for them all. This is too broad.
            As 
we recently noted, it has always been the law of equity that a permanent 
injunction “must not grant relief which is . . . more comprehensive or 
restrictive than justified by the pleadings, the evidence, and the usages of 
equity.” 

 Thus, for example, a permanent injunction against protests at five physicians’ 
homes is too broad if the evidence shows protests occurred at only four. 

 Similarly, evidence of flies and foul odors from a 10-acre feedlot does not 
justify a permanent injunction extending to an entire 450-acre ranch. 

 An injunction may extend as far as the evidence, but no further.
            In 
their Article VIII claim, the plaintiffs did not challenge the tax-rate cap 
facially, 

 but only as it applied to them. “In an as-applied constitutional challenge, we 
must evaluate the statute as it operates in practice against the particular 
plaintiff.” 

 Yet the trial court did not even try to evaluate how the property-tax cap 
operates in practice against most of the 47 plaintiffs, much less the other 984 
districts covered by the statewide permanent injunction. As the question is one 
of constitutionality, we cannot simply presume that all districts are alike.
            The 
trial judge pointed to evidence from nine “focus districts” and the testimony of 
a dozen superintendents as proof that loss of meaningful discretion was 
“systemic/statewide.” But there was no evidence these districts were 
statistically representative of all others. To the contrary, the handful of 
successful focus districts were unrepresentative — 78 percent of the 
plaintiffs’ focus districts were poor districts, while 72 percent of the actual 
plaintiffs were rich ones.
            Nor 
did the parties agree that proof about the focus districts proved anything about 
the rest. Even if they had, such an agreement would be unenforceable. In 
Terrazas v. Ramirez, we reversed a permanent injunction that ordered 
election redistricting based on an agreement by all the parties (including the 
Governor and Attorney General), 

 noting that such agreements are generally unenforceable in cases affecting the 
public:
Apportionment 
affects every person in the State, yet only a very few parties can be involved 
in any lawsuit challenging redistricting. The trial court must attempt to 
consider the interests, not only of the parties in the case, but of others who 
are not present. For this reason, the agreement of the parties in a 
reapportionment lawsuit cannot alone be conclusive of either the validity of the 
statute or, if it is found to be invalid, the relief to be granted. 

 
Similarly, as schools and 
property taxes affect far more Texans than the parties at this trial (none of 
whom, again, were simply taxpayers or families of school children), the trial 
court could not grant relief covering districts as to which there was no proof. 


 
            In 
a state as diverse as Texas, some programs and expenses may be mandatory in one 
district, but supplemental in another. Even if a dozen districts proved that 
they were forced to incur all their expenditures (which none did), that would 
not justify an injunction extending beyond them. 

 
            This 
is not a class action. No class has been certified, and given the individual 
ways in which each school district spends money, it is unlikely any could be. 
But even if one was, we could not grant relief extending to nonparty school 
districts without a “rigorous analysis.” 

 Yet the Court today grants a statewide injunction affecting hundreds of 
nonparty school districts without class certification, evidence, analysis, or 
even an explanation. This looks too much like “enjoin now and worry later.” 

 
B. Too Many Statutes
            Second, 
there is no evidence to support an injunction against every statutory aspect of 
the Texas school-finance system. 
            The 
Court finds only one constitutional violation — that the tax-rate ceiling in 
subsection 45.003(d) of the Education Code violates Article VIII. As already 
noted, there is no evidence showing this is the case in every school district in 
Texas. But even if there were, that would justify nothing beyond declaring this 
one subsection unconstitutional.
            When 
we declared a single provision of the Water Code an unconstitutional delegation 
to landowners, we did not enjoin all water quality regulations in Texas. 

 When we found a single provision of the Tax Code unconstitutional, we did not 
enjoin all taxes; to the contrary, we reformed the lower court’s injunction to 
make it narrower. 

 When we found an absolute two-year statute of limitations for medical 
malpractice claims unconstitutional as applied to minors, we did not enjoin the 
entire statute but merely tolled limitations for minors. 

 
            In 
each of these cases, we narrowly limited our orders to the legislation we found 
unconstitutional. By the same standard, if the Legislature imposed a property 
tax on the nine Texas counties whose names begin with “J”, surely we would 
declare only that statute unconstitutional; we would not stop all state 
funding in those counties, much less in the other 245.
            But 
today the Court does precisely that, finding one subsection unconstitutional as 
applied to nine focus districts, and then affirming an injunction against the 
entire Texas school-finance system. This injunction includes most of Chapters 41 
and 42 of the Texas Education Code — a collection of almost 100 different 
statutes. This is far too broad.
            The 
Court acknowledges that the single violation here could be corrected by limiting 
relief to that single statute. 

 But it imposes far more sweeping relief, on the ground that we must “leave such 
matters to the discretion of the Legislature.” 

 In other words, rather than enjoining a single statute in a handful of 
districts, the Court enjoins scores of statutes across the entire State — in 
deference to the Legislature. Reasonable people may question whether this is 
very much deference.
            It 
is true that we have enjoined the entire school-finance system before, but never 
for grounds as limited as those here. 

 In Edgewood I and II, there was a “fundamental flaw” in the 
system, “not in any particular provisions but in its overall failure to 
restructure the system.” 

 By holding that Article VII required the entire system to “draw revenue from 
all property at a substantially similar rate,” 

 our ruling could not be narrowly limited to a small part. 
            Similarly, 
because the statute we held unconstitutional in Edgewood III mandated a 
state property tax in every Texas county, the injunction we issued had to cover 
every county too. 

 Nor could we limit relief to the portion of the system held unconstitutional, 
as there would have been little financing left over for schools without it. 

 
            By 
comparison, nothing about the Article VIII claim here inevitably extends to the 
whole school-finance system. Surely a single violation of Article VIII anywhere 
cannot justify an injunction shutting down school finances everywhere.
            The 
Court says the current system cannot survive without the tax-rate cap, because 
“for districts that need additional revenue, the funding system would be 
inefficient.” 

 But the Court cannot have it both ways — if school districts “need” more 
funding, then current funding cannot be adequate for a general diffusion of 
knowledge; conversely, if the current funding is adequate (as the Court 
explicitly holds), then the cap only affects supplemental spending. As the Texas 
Constitution does not guarantee equal supplemental spending, 

 the cap is hardly “central” to a 
constitutional system. 

 
            Of 
course, it is no mystery why the plaintiff school districts never asked for 
narrower relief. If only section 45.003(d) were declared unconstitutional, they 
would once again have meaningful discretion to set tax rates as they wish, and 
could raise them to pay for all the programs they say their communities demand. 
But they also might find out at the next election that their beliefs about 
community demand were somewhat exaggerated.
            Instead, 
by enjoining school-finance across the state, the school districts here hope to 
obtain funding from sources other than those within their own borders. Raising 
revenues from outside sources is unlikely to make school districts more 
accountable or more efficient. Neither equity nor the Texas Constitution allows 
school districts to demand supplemental programs on condition that someone else 
pay for them. 
* * *
            The 
Court closes by reminding the Legislature how important education is to the 
future of this State and its people. This seems an odd way to conclude an 
opinion that rejects every claim except that the Legislature has imposed a 
statewide ad valorem tax. If our goal is to improve education, we should not 
enjoin the entire school-finance system on collateral grounds to pressure the 
Legislature to change it. 
            But 
we should demand efficiency, as that is what the Texas Constitution requires. 
Recognizing the common meaning of “efficient” would not require us to abandon 
our previous school-finance cases, or the equity for Texas schools they require. 
But we cannot keep overlooking the one standard the Texas Constitution 
explicitly demands. Nor do we help Texas school children by insisting 
“efficient” means nothing beyond equal access to taxes.
            Someday, 
the Texas school system must become “efficient” by 21st century standards. As 
that is what the Texas Constitution requires, we should start that process 
today.
 
                                                                                    ________________________________
                                                                                    Scott 
Brister
                                                                                    Justice
OPINION DELIVERED: November 22, 
2005